## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

UNITED STATES OF AMERICA

v.                                                          CRIMINAL ACTION NO. 5:21-cr-00116

KEVIN GLENN

## MEMORANDUM OPINION AND ORDER

Pending is Defendant Kevin Glenn's Motion to Suppress Evidence [Doc. 25], filed August 31, 2021. The Court held an evidentiary hearing on September 30, 2021. Mr. Glenn appeared with counsel, J. Miles Morgan, along with the United States by Assistant United States Attorney L. Alexander Hamner.

The Court heard testimony from two witnesses, namely, Mr. Glenn and Detective Travis Myers of the Phoenix Police Department, who testified remotely from Arizona. Following the receipt of post-hearing briefs, the matter is ready for adjudication.

### I.

On April 20, 2020, Mr. Glenn arrived at the Phoenix Sky Harbor International Airport. He encountered members of the Phoenix Police Department. During this encounter, Detective Elizabeth Poole and other officers found $32,020 in United States Currency and three cell phones spread between Mr. Glenn's three pieces of luggage. [Doc. 44 at 3]. Mr. Glenn was not arrested at this time, but his cash and cell phones were seized. [Doc. 25 at 5].

Approximately one month after this encounter, a confidential informant contacted one of the numbers associated with a phone seized from Mr. Glenn to set up a controlled narcotics

purchase. The confidential informant completed the controlled purchase in Beckley, West Virginia on May 21, 2020. That purchase is the subject of the pending indictment against Mr. Glenn for distribution of heroin. [Doc. 13].

Mr. Glenn moves to suppress the following evidence from the April 20, 2020, encounter: (1) three cell phones, (2) cash, (3) his statements to Detective Poole, and (4) any additional discovery not produced to date.

## II.

The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Court is required to ascertain "at what point in [the subject] encounter the Fourth Amendment becomes relevant." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The Court will first discuss police-citizen encounters in general, and then follow with the law governing other principles necessary to adjudicate this matter, namely, the rules respecting (1) suspect questioning, (2) the warrant requirement, and (3) the voluntary consent doctrine.

### A.    Police-Citizen Encounters Generally

The Fourth Amendment is generally not implicated in a "police-citizen encounter," where law enforcement officers approach someone in a public place and speak with them. *Florida v. Bostick*, 501 U.S. 429, 439–40 (1991); *Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Lewis*, 606 F.3d 193, 197–98 (4th Cir. 2010); *United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008); *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002); *United States v. Analla*, 975

F.2d 119, 124 (4th Cir. 1992); *United States v. Flowers*, 912 F.2d 707, 711–12 (4th Cir. 1990). The Fourth Amendment is triggered, however, once an individual has been seized and is no longer free to leave, such as during an investigatory stop supported by reasonable suspicion. *INS v. Delgado*, 466 U.S. 210, 215 (1984); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *United States v. Mendenhall*, 466 U.S. 544, 553–54 (1980); *United States v. Sullivan*, 138 F.3d 126, 133 (4th Cir. 1998); *United States v. Lattimore*, 87 F.3d 647, 653 (4th Cir. 1996) (en banc). "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." *Weaver*, 282 F.3d at 309–10.

As noted, the legitimacy of an investigatory stop thus turns on what constitutes "reasonable suspicion." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). The United States Court of Appeals for the Fourth Circuit has cast the matter as "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." *Id.* at 154. Reasonable suspicion is based upon the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Arvizu*, 534 U.S. 266 (2002); *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016); *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008); *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). Inasmuch as an investigatory stop is often minimally intrusive, the reasonable suspicion standard is not onerous. *See, e.g., United States v. Guiterrez*, 963 F.3d 694, 698–700 (4th Cir. 2011).

B.     **Suspect Questioning and the *Miranda* Rule**

"Concerns under *Miranda [v. Arizona*, 384 US 436 (1966)] only arise when a

defendant is in custody and subjected to interrogation." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017). Where there is reasonable suspicion or probable cause to detain or search property, temporary detention or control of individuals associated with the property is also permissible. *See Illinois v. McArthur*, 531 U.S. 326, 331 (2001); *Michigan v. Summers*, 452 U.S. 692, 702–05 (1981); *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 239 (4th Cir. 2001), *abrogated on other grounds, Crawford v. Washington*, 541 U.S. 36, 63–64 (2004). This temporary detention is akin to a *Terry* stop and does not amount to a custodial interrogation requiring *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 434 (1984); *United States v. Leshuk*, 65 F.3d 1105, 1108–09 (4th Cir. 1995); *see generally Terry*, 392 U.S. at 30.

But a temporary detention can morph into a de facto arrest, thus requiring *Miranda* warnings; the line between the two is insusceptible to "a hard and fast time limit." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). An objective standard governs whether a suspect has been arrested. It depends upon whether "the suspect's freedom of action [has been] curtailed to a degree associated with formal arrest." *United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007) (quoting *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001)). A suspect's feeling about whether she was free to leave is irrelevant. *Stansbury v. California*, 511 U.S. 318, 323 (1994); *Elston*, 479 F.3d at 319–20; *Leshuk*, 65 F.3d at 1109–10; *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987).

Absent required *Miranda* warnings in a custodial interrogation, statements are presumptively coercive when the statements are involuntarily provided. *United States v. Patane*, 542 U.S. 630, 639 (2004). Voluntary statements given in violation of *Miranda* are not awarded the same presumption. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The Supreme Court has concluded a failure to provide necessary *Miranda* warnings does not require suppression of physical fruits of a suspect's unwarned yet voluntary statements. *Patane*, 542 U.S. at 640.

C.      **The Warrant Requirement Generally**

In addition to the aforementioned, textual assurance, the Fourth Amendment guarantees that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The guarantee has kept pace with technology. For example, the Supreme Court has emphasized the importance of cell phones in today's society and extended thereto certain Fourth Amendment protections. *See Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) ("[W]e hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [cell-site location information]."); *Riley v. California*, 573 U.S. 373, 402 (2014) (requiring a warrant to search a phone seized incident to arrest).

"[T]he concept of probable cause [embedded in the Fourth Amendment] is not subject to a precise definition." *United States. v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011). Nonetheless, in describing probable cause, the Supreme Court "has explained that probable cause 'exists where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "An assessment of the presence of probable cause must be based on the totality of the relevant circumstances, rather than on the technical or rigid demands of a formulaic legal test." *Id.* Thus, in making a probable cause assessment "when examining a warrant application, a judicial officer must make a 'common-sense' determination whether the application shows a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also United States v. Anderson*, 851 F.2d 727, 729

(4th Cir. 1988) (explaining that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence").

For a judicial officer to conclude that probable cause exists to support the issuance of a warrant, there must be sufficient information presented to her that is more than conclusory or bare bones. *United States v. Leon*, 468 U.S. 897, 915 (1984). When examining the affidavit, a judicial officer "may rely on law enforcement officers, who may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person,'" so long as the affidavit contains facts to support the officer's conclusions. *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010) (quoting *Arvizu*, 534 U.S. at 273).

Once a search warrant has been issued, a review of the judicial officer's probable cause determination is afforded "great deference." *Jones*, 942 F.3d at 638 (citing *Gates*, 462 U.S. at 236–38). Indeed, the reviewing court need only determine whether "the judicial officer had a 'substantial basis' for finding probable cause." *Id.* In doing so, the reviewing court "considers only the facts presented in the warrant application." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019). Moreover, the reviewing court should "resist the temptation 'to invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (quoting *Gates*, 462 U.S. at 236)).

## D.     The Voluntary Consent Doctrine

A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218,

226 (1973); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). When a consent to search is challenged, the court must determine, based upon the "totality of the circumstances," whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. *See, e.g.*, *United States v. Mendenhall*, 466 U.S. 544, 557 (1980); *Schneckloth*, 412 U.S. at 226; *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998); *United States v. Elie*, 111 F.3d 1135, 1144 (4th Cir. 1997). Although consent must be knowing and voluntary, the government is *not* required to show that an individual was told or otherwise knew he had the right to refuse consent. *See, e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996); *United States v. Brugal*, 209 F.3d 353, 362 (4th Cir. 2001) (en banc); *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *Elie*, 111 F.3d at 1146; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

The following factors are to be considered in determining whether consent to search was given freely and voluntarily:

> [T]he characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter). Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. Written consent supports a finding that the consent was voluntary. Consent given while in custody may still be voluntary.

*Boone*, 245 F.3d at 361–62 (internal citations omitted). Additionally, "[n]either drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself." *Elie*, 111 F.3d at 1145–46 (internal quotations omitted). Furthermore, the absence of *Miranda* warnings, standing alone, is insufficient to render a consent to search involuntary. Rather, "the absence of *Miranda* warnings is a factor to be considered in assessing whether a defendant's consent was given voluntarily . . . [in light of] the totality of the circumstances . . . ." *Id.* at 1146 (internal citation omitted).

### III.

#### A.     *Initial Encounter at Airport*

Mr. Glenn contends he was detained and seized at the Phoenix airport, and the subsequent search of his bags and person violated the Fourth Amendment. [Doc. 25 at 6]. The Government responds the initial encounter between Mr. Glenn and law enforcement was consensual and did not amount to a seizure. [Doc. 33 at 7–8; Doc. 44 at 7–8; Doc. 46 at 5]. Detective Myers testified that, after receiving intelligence regarding airline passengers, plain-clothes detectives will (1) contact those individuals in public areas of the airport, (2) ask for permission to speak with them, and (3) search their bags if applicable. [Doc. 43 at 7-8]. In Mr. Glenn's case, Detective Myers testified law enforcement received intelligence regarding Mr. Glenn's travel itinerary and criminal history, and Detective Poole initiated contact with Mr. Glenn while Detective Myers assisted. [*Id.* at 18–19].

On the recording of the encounter, Detective Poole and Detective Myers approached Mr. Glenn. Detective Poole introduced herself as a police officer, informed Mr. Glenn he was not in trouble, stated she was looking for some passengers who deplaned from his Charlotte flight, and asked for his identification and boarding pass. [Doc. 33-1 at 0:09–0:25]. Detective Poole told Mr. Glenn they approached him because his ticket purchase in Charlotte was flagged, and the officers needed to verify some information. [*Id.* at 0:55–1:20]. As noted, based on the background noise in the recording, it seems the encounter took place in a public area of the airport. Detective Poole's tone was not commanding, she repeatedly assured Mr. Glenn he was not in trouble, and she stated she just wanted to talk to him. Mr. Glenn was not under arrest, and he was free to leave and meet his connecting flight. This type of police-citizen interaction is clearly permissible and

does not implicate the Fourth Amendment. There is no basis for suppression to this point.

**B.      *Whether the Search of the Crossbody Bag was Supported by Voluntary Consent***

Mr. Glenn contends he never consented to the search of his crossbody bag or, if he did, it was involuntary. [Doc. 25 at 7]. The Government responds Mr. Glenn provided consent by (1) handing one bag to Detective Myers, and (2) opening the other bag for Detective Poole to view. [Doc. 44 at 8]. Detective Myers offered similar testimony. [Doc. 43 at 15, 24]. In reply, Mr. Glenn admits he gave specific consent to search his carryon bag,[1] but reasserts that he never gave consent to search his crossbody bag[2] or checked bag. Further, Mr. Glenn asserts he was never told he could refuse consent. [Doc. 45 at 10].

On the recording, Detective Poole asked when Mr. Glenn purchased his tickets. Mr. Glenn responded that he and his companion's tickets were a counter purchase at the Charlotte airport. Detective Poole reassured him the purchase was entirely legal, but that it was likely the reason Mr. Glenn's itinerary was flagged. [Doc. 33-1 at 0:55–1:20]. She asked about Mr. Glenn's connecting flight, number of bags he was traveling with, and if he possessed any narcotics or illegal substances. [*Id.* at 1:21–1:58]. Detective Poole asked if Mr. Glenn was traveling with large amounts of currency, and Mr. Glenn responded -- falsely -- in the negative. This justifiably drew suspicion inasmuch as when he was further asked how much cash he was traveling with, Mr. Glenn stated "How much would I say I have? As far as cash in total? Well, I have a – I have some money.

---

[1] This "carryon" bag refers to a neon green Nike duffel bag in Mr. Glenn's possession at the time of the encounter. No evidence was recovered from the carryon bag.

[2] The "crossbody" bag is referred to in the record variously as "man bag," "sling bag," or "personal item." For ease of reference, the Court refers to the item as the "crossbody" bag worn by Mr. Glenn during the encounter.

I have maybe like, *eight thousand, nine thousand*." [*Id.* at 2:03–2:16 (emphasis added)]. In response, Detective Poole asked where the cash was located and if she could see how it was packaged. [*Id.* at 2:17–2:23]. Mr. Glenn complied. Detective Myers asked if it was okay to look in Mr. Glenn's crossbody bag; the recording contains Mr. Glenn's audible consent,[3] after which zippers can be heard. [*Id.* at 3:14–3:16].

Moreover, under the totality of the circumstances, it appears Mr. Glenn's consent to search his crossbody bag was knowing and voluntary. From the beginning of the encounter, Mr. Glenn was free to leave and not answer Detective Poole's questions. Instead of leaving to find the gate for his connecting flight, Mr. Glenn continued speaking with Detective Poole in a public area of the airport, and he allowed detectives to look in his crossbody bag to see how his cash was packaged.

Respecting Mr. Glenn's contention that he was unaware of his right to refuse consent, the Government noted his extensive criminal history and refusal of consent concerning his cell phones. These two considerations are significant. Moreover, while Mr. Glenn's understanding of his right to refuse consent is relevant regarding the question of voluntariness, the Government need not show Mr. Glenn knew he had the right to refuse. *See Robinette*, 519 U.S. at 39–40 (1996); *Brugal*, 209 F.3d at 362; *Boone*, 245 F.3d at 362; *Elie*, 111 F.3d at 1146; *Lattimore*, 87 F.3d at 650.

Based upon the foregoing, there is no basis to suppress evidence discovered in the

---

[3] Detective Myers indicated Mr. Glenn did not explicitly say "yes," but he did make an audible "mm-hmm" sound to reflect his consent to search prior to opening the bag himself and handing the bag to Detective Myers. [Doc. 43 at 24]. There is very clearly some utterance from Mr. Glenn prior to the bag being unzipped. After listening to the recording dozens of times, the Court finds the subject portion of the clip reflects Detective Myers asking "And is it okay to look in here . . . ," with Mr. Glenn then responding "That's no problem sir."

crossbody bag.

### C.     Whether the Search of the Checked Bag Was Supported by Voluntary Consent

Mr. Glenn asserts he never gave consent for the detectives to search his checked bag. The Government responds that Mr. Glenn gave consent to search this bag when he gave consent to search his crossbody bag. Detective Myers testified to the same. [Doc. 43 at 15-16].

On the recording of the initial encounter, Detective Poole asked Mr. Glenn if he had checked a bag for his flight, and Mr. Glenn said yes. [Doc. 33-1 at 2:40–2:50]. After Detective Poole asked Mr. Glenn if he had a checked bag, the audio is slightly muffled, and the nature of Detective Poole's next statement and Mr. Glenn's response are unclear. [*Id.* at 2:44–2:48]. Mr. Glenn provided the Court with a transcript of the audio recordings. [Doc. 45-1]. In this transcript, Detective Poole is reported as saying, "Okay. When we locate that bag, we're going to check for those items [additional cash and narcotics]." [Doc. 45-1 at 4]. Thus, by Mr. Glenn's account, Detective Poole told Mr. Glenn that she would be searching his checked bag rather than asking for consent. [Doc. 45 at 9].

The Government disagrees with the accuracy of this transcript. It contends Detective Poole actually said, "If we locate that bag we can check it for those items (inaudible), sir?" noting the inflection in Detective Poole's voice denoted a question. [Doc. 46 at 2]. While the transcript provided by Mr. Glenn is helpful, the audio recording is the best evidence of the encounter. And the Government offers the superior analysis of the interaction. Detective Poole's response of "Thank you sir" following the apparent question indicates her initial statement including the words "we can check it" was indeed a query and Mr. Glenn responded in the affirmative thereto.

Moreover, assuming the lack of consent to search Mr. Glenn's checked bag, the search of the bag would nevertheless be permissible if detectives had probable cause to do so. Notably, detectives searched Mr. Glenn's checked bag after the initial encounter. The search thus occurred after (1) Mr. Glenn misled the detectives about the immense amount of cash in his possession, (2) Mr. Glenn's itinerary was flagged for making a last minute, one-way ticket purchase with cash from Charlotte, North Carolina, to Los Angeles, California, a known drug source area [Doc. 43 at 20], (3) detectives discovered Mr. Glenn had a criminal history, (4) his itinerary was deemed identical to that used by drug couriers [*Id.* at 19–20], (5) Mr. Glenn told detectives he was traveling for pleasure, despite the fact the trip occurred during the beginning of the COVID-19 Pandemic when many non-essential businesses were closed [Doc. 44 at 13], and (6) the detectives' search of Mr. Glenn's crossbody bag produced three mobile phones and a large amount of cash bound by rubber bands. [*Id.* at 12–13].

Under the totality of the circumstances, these factors combined to produce the necessary probable cause to search Mr. Glenn's checked bag irrespective of Mr. Glenn's valid consent. Based upon the foregoing, there is no basis to suppress evidence discovered in the checked bag.

### D. The Cell Phones

Mr. Glenn challenges the search warrant obtained to forensically examine his three cell phones seized during the Phoenix Airport encounter. Specifically, Mr. Glenn contends that the Government has not timely performed the forensic examinations of Mr. Glenn's cell phones, which has or will result in the disclosure of voluminous evidence too close to trial. [Doc. 25 at 12]. Mr. Glenn further contends the phones were seized illegally and any data forensically extracted

therefrom is consequently tainted and inadmissible. [*Id.* at 15; Doc. 45 at 11]. The Government asserts both the Maricopa County Superior Court for the State of Arizona and the United States District Court for the Eastern District of Michigan determined probable cause existed to issue the challenged warrants. [Doc. 33 at 8; Doc. 25-1 at 20].

Insofar as Mr. Glenn contends the forensic extraction report of cell phone data has not yet been disclosed and should therefore be suppressed, the recent continuance granted by the Court moots the contention. Respecting the putative taint on the search warrant, the Court has thus far detected no fruit borne by a poisonous tree. The challenged encounter and searches were either consensual or supported by probable cause. [Doc. 46 at 5].

Moreover, one must consider Detective Poole's interview of Mr. Glenn prior to seizing his cell phones. As noted, the initial encounter between Mr. Glenn and the detectives was consensual. Detective Poole initiated another encounter with Mr. Glenn to inquire about the additional cash and marijuana found in his checked bag, indicating Mr. Glenn's checked bag had been searched. [Doc. 33-2 at 0:00–0:20]. Detective Poole asked Mr. Glenn to accompany her and Detective Myers to the police offices to verify the amount of cash contained in his bags. Additionally, Detective Poole told Mr. Glenn's companion who possessed the same itinerary as Mr. Glenn, that she could leave and catch her flight. [*Id.* at 0:34–0:40]. The implication from this statement to the companion might be interpreted that Mr. Glenn was not free to leave because he was not explicitly told he could do so.

But that isolated reading ignores the purpose for which Mr. Glenn's presence was required. There were thousands of dollars in cash to be verified and accounted for prior to the checked bag being released. Mr. Glenn thus accompanied the detectives to law enforcement offices where the cash was counted and Mr. Glenn was interviewed. As noted, detectives had probable

cause to search Mr. Glenn's checked bag; indeed, a temporary detention was both necessary and appropriate while the bag was searched. The recordings of the interview total approximately thirty minutes in length, which is a reasonable amount of time for a large quantity of bundled cash to be counted and inventoried.

The non-custodial nature of the encounter, however, is apparent even upon close scrutiny. Detective Poole interviewed Mr. Glenn, during which time Mr. Glenn made statements regarding his travel plans, his occupation as a rap artist, and his financial situation. [Doc. 33-3 at 1:54–12:10]. Detective Poole told Mr. Glenn that he could not have his cash back unless he verified the source and purpose of the money. [Doc. 33-4 at 0:07–0:45]. Detective Poole asked multiple times for consent to search Mr. Glenn's phones for narcotic activity, and he denied consent. [Doc. 33-3 at 25:25–26:08]. Mr. Glenn did, however, provide the phone numbers for each phone. [Doc. 33-3 at 12:57–13:56]. Detective Poole seized the cell phones and told Mr. Glenn she was obtaining a warrant for the phones. [Doc. 33-4 at 1:18–1:31]. That warrant would have been justified based upon the probable cause summarized *supra* at Section III.C. Importantly, Mr. Glenn asked if he was being arrested and Detective Poole said he was not. [Doc. 33-4 at 1:47–1:50]. Mr. Glenn was not arrested, and he was allowed to leave the airport.

Assuming, *arguendo*, the temporary detention morphed into a de facto arrest requiring *Miranda* warnings, Mr. Glenn's statements were one piece of Detective Poole's probable cause determination to seize the phones. The fruits of unwarned statements should not be suppressed when those statements are voluntary. *Patane*, 542 U.S. at 640. Indeed, it appears Mr. Glenn's statements during the interview were entirely voluntary. Detective Poole's tone and demeanor mirrored her conduct during the initial encounter. She was neither commanding nor coercive, but merely direct concerning the information sought. Mr. Glenn answered her questions,

14

occasionally asking for clarification before answering. The statements were voluntary, and their use in the totality of the circumstances analysis is permissible even if *Miranda* warnings were necessary.

Under the totality of the circumstances -- the initial encounter, search of the bags, and the interview -- Detective Poole had probable cause to seize Mr. Glenn's cell phones. After the encounter on April 20, 2020, law enforcement obtained search warrants for Mr. Glenn's cell phones. In addition to information about the April 20, 2020, encounter with Mr. Glenn at Phoenix Sky Harbor International Airport, the attached affidavit includes extensive information regarding the investigation of a large-scale drug trafficking operation and Mr. Glenn's connection to such operation. [Doc. 25-1]. Viewing the facts within the affidavit, the judicial officer had a substantial basis to find probable cause to issue a search warrant for Mr. Glenn's cell phones. There is thus no basis for suppression to this point.

### E.      The Statements to Detective Poole

Mr. Glenn asserts the statements given to Detective Poole should not be admitted against him because the statements were given without *Miranda* warnings. [Doc. 25 at 10–11]. The Government responds it does not intend to introduce the statements made by Mr. Glenn at trial. [Doc. 33 at 10]. This portion of Mr. Glenn's challenge is thus moot.

### IV.

Based upon the foregoing discussion, the Defendant's Motion to Suppress **[Doc. 25]** is **DENIED.**

15

The Clerk is directed to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the Office of the United States Marshal.

ENTER: February 14, 2022

Frank W. Volk
United States District Judge